UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

_____

DEWAYNE D. KNIGHT,
              Plaintiff,
v.                                           Case No. 15-cv-706-pp

DR. THOMAS W. GROSSMAN,
WAUPUN MEMORIAL HOSPITAL, and
ST. AGNESIAN HEALTHCARE,

              Defendants.
_____

### DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS* (DKT. NO. 2) AND SCREENING PLAINTIFF'S COMPLAINT
_____

DeWayne Knight, a state prisoner, filed a *pro se* complaint under 42 U.S.C. §1983, alleging that his civil rights were violated while he was an inmate at Waupun Correctional Institution (WCI). Dkt. No. 1. The case is before the court on the plaintiff's motion for leave to proceed *in forma pauperis* (Dkt. No. 2) and for screening of the plaintiff's complaint.

### I.    MOTION FOR LEAVE TO PROCEED *IN FORMA PAUPERIS*

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated when he filed his complaint. 28 U.S.C. §1915. That law allows a court to give an incarcerated plaintiff the ability to proceed with his lawsuit without pre-paying the civil case-filing fee, as long as he meets certain conditions. One of those conditions is a requirement that the plaintiff pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial

1

partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time through deductions from his prisoner account. Id.

On June 19, 2015, the court issued an order requiring the plaintiff to pay an initial partial filing fee of $.97. Dkt. No. 6. The plaintiff paid that fee on June 29, 2015. Accordingly, the court will grant the plaintiff's motion for leave to proceed without pre-paying the filing fee and allow the plaintiff to pay the balance of the $350.00 filing fee over time from his prisoner account, as described at the end of this order.

## II. SCREENING OF THE PLAINTIFF'S COMPLAINT

### A. Standard for Screening Complaints

The law requires the court to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss part or all of a complaint if the plaintiff raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. §1915A(b).

To state a claim under the federal notice pleading system, the plaintiff must provide a "short and plain statement of the claim showing that [he] is entitled to relief[.]" Fed. R. Civ. P. 8(a)(2). A plaintiff does not need to plead specific facts, and his statement need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41,

2

47 (1957)). A complaint, however, that offers "labels and conclusions" or "formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 555). To state a claim, a complaint must contain sufficient factual matter, accepted as true, "that is plausible on its face." Id. (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). The complaint allegations "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citation omitted).

In considering whether a complaint states a claim, courts follow the principles set forth in Twombly. First, the court must "identify[] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Iqbal, 556 U.S. at 679. A plaintiff must support legal conclusions with factual allegations. Id. Second, if there are well-pleaded factual allegations, courts must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that the defendants: 1) deprived the plaintiff of a right secured by the Constitution or laws of the United States; and 2) acted under color of state law. Buchanan-Moore v. Cnty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citing Kramer v. Vill. of N. Fond du Lac, 384 F.3d 856, 861 (7th Cir. 2004)); see also Gomez v. Toledo, 446 U.S. 635, 640 (1980). The court is obliged to give

3

the plaintiff's *pro se* allegations, "however inartfully pleaded," a liberal construction. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97, 106 (1976)).

B.  Facts Alleged in the Complaint

The complaint alleges that on December 29, 2012, the plaintiff injured his left knee at WCI. Dkt. No. 1 at 7-8. On January 25, 2013, the plaintiff saw Dr. Hennessy (one of the doctors in WCI's health unit), who made an initial diagnosis of a torn anterior cruciate ligament (ACL), and referred the plaintiff to defendant Dr. Thomas W. Grossman. Id. at 8.

On February 14, 2013, WCI staff transported the plaintiff to St. Agnesian Health Care – Waupun Memorial Hospital (Hospital) for a consultation with Dr. Grossman. Id. Dr. Grossman examined the plaintiff, and Dr. Grossman and the hospital's nursing staff performed a series of tests. Id. They did not conduct a magnetic resonance imaging (MRI) test that day. Id. at 9. Dr. Grossman diagnosed a torn ACL in the plaintiff's left knee and offered a revision (a procedure which uses graft tissue to repair the tear). Id. at 8. Dr. Grossman suggested that this would "possibly help and fix his problem." Id.

Dr. Grossman described the procedure as an elective operation with risks separate and distinct from the risks of anesthesia. Id. Dr. Grossman offered two types of graft procedures: (1) an Autograft procedure with tissue from the plaintiff's other knee; and (2) an Allograft procedure with tissue from a tissue bank. Id. at 9. The plaintiff indicated that he understood and preferred to have an Autograft procedure with his own tissue. Id. Dr. Grossman advised that the

4

Autograft procedure was "double" knee surgery and could require the plaintiff to spend time in the infirmary and wear a brace afterwards. Id.

On May 15, 2013, WCI staff again transported the plaintiff to the Hospital. Id. Nurses prepared the plaintiff for the Autograft reconstruction with tissue from his other knee. Id. Dr. Grossman saw the plaintiff in the pre-operation room and explained the procedure, that the plaintiff would receive "double" knee surgery and that one third of the plaintiff's patella tendon would be taken from his right knee and used as the graft to repair the torn ACL in the plaintiff's left knee. Id. The plaintiff gave written and verbal consent for the procedure in the operating room and was then placed under anesthesia. Id. at 10.

During the surgery, Dr. Grossman discovered that the plaintiff did not have a torn ACL. Id. Instead of repairing a torn ACL, Dr. Grossman performed two other surgical procedures without consent from the plaintiff: a "Chondroplasty" and an "Abrasion Arthroplasty." Id. Dr. Grossman had not made any reference to performing either of these procedures during the pre-operation discussion, and neither the plaintiff nor the Wisconsin Department of Corrections consented to either of these procedures. Id. When the plaintiff woke up from the anesthesia, he realized he did not receive the procedure to which he had consented. Id. at 11. He was transported back to WCI without any explanation from Dr. Grossman or the nurses. Id.

The plaintiff had a follow-up appointment at the Hospital during the first week of October. Id. At that time, Dr. Grossman explained to the plaintiff that

5

his ACL was not torn and was intact and functioning. Id. However, Dr. Grossman told the plaintiff that he had "significant patellofemoral joint degenerative joint disease," which the doctor described as "significant arthritis." Id. Dr. Grossman indicated that the plaintiff actually needed a full knee replacement in his left knee, but he said that the plaintiff was too young to receive the knee replacement. Id. He said that if the plaintiff had the knee replacement so young, the replacement knee would wear out within 10 years due to the plaintiff's physical activity. Id. Dr. Grossman further said that the plaintiff may eventually have to have his left leg amputated from the knee down because there would be nothing else that could be done after the knee replacement. Id. Dr. Grossman explained to the plaintiff that he "cleaned up" the arthritis the best way he could with the two procedures he did perform. Id. at 11-12.

The plaintiff told Dr. Grossman that he was upset about the change in diagnosis and that he did not give consent for two additional surgical procedures. Id. at 12. The plaintiff also indicated that his condition seemed worse than before the surgery. Id.

The plaintiff alleges that the surgery was painful, and that he now is in constant pain and on multiple medications. Id. He can no longer enjoy playing sports, which he used to be able to do; he cannot stand for long periods of time; and he cannot stay seated with his leg bent for long periods of time. Id. The plaintiff cannot do any heavy lifting, his daily living activities have been disrupted, and he has lost future earning ability. Id. The plaintiff also suffers

6

mental and emotional distress due to his traumatic experience with these health care providers. Id.

The plaintiff asserts that Dr. Grossman misdiagnosed him and then performed surgery based on that misdiagnosis. Id. at 13. He also claims that Dr. Grossman failed to obtain a new informed consent before he performed the new procedures, and therefore performed surgical procedures to which the plaintiff did not consent. Id. According to the plaintiff, Dr. Grossman caused him further injury and significant pain by performing two unauthorized procedures and inflicted offensive contact on the plaintiff's body while he was unconscious. Id.

The plaintiff submits that the defendants had a duty to properly diagnose the plaintiff, to inform him of the misdiagnosis and the correct diagnosis, and to obtain the plaintiff's informed consent before new surgical procedures were performed. Id. at 14. The plaintiff argues that the defendants breached those duties. Id. He also maintains that he had a due process right to refuse the surgical procedures, and alleges that he never was given the opportunity to refuse them. Id.

The plaintiff proposes state law medical negligence claims against Dr. Grossman and a Fourteenth Amendment constitutional claim against all the defendants. Id. at 14-17. He seeks declaratory and injunctive relief, as well as compensatory and punitive damages. Id. at 17-18.

C.  Legal Analysis of Alleged Facts

The plaintiff asserts that the defendants violated his Fourteenth Amendment rights to due process and equal protection when Dr. Grossman performed two surgical procedures to which the plaintiff had not consented.

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." In Cruzan by Cruzan v. Dir., Mo. Dept. of Health, 497 U.S. 261, 278 (1990), the Supreme Court stated, "[t]he principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions." However, "determining that a person has a 'liberty interest' under the Due Process Clause does not end the inquiry; 'whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests.'" Cruzan, 497 U.S. at 279 (quoting Youngberg v. Romeo, 457 U.S. 307, 321 (1982)).

In the same term, the Supreme Court concluded that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." Washington v. Harper, 494 U.S. 210, 221-222 (1990). "The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty." Id. at 229. Finally, the Seventh Circuit has held that "written consent does not constitute consent to an operation other than the one to be performed when there is no evidence that

8

a necessity arose during the authorized operation." Lloyd v. Kull, 329 F.2d 168, 170 (7th Cir. 1964).

Dr. Grossman violated the plaintiff's Fourteenth Amendment rights only if he was acting under the color of state law when he operated on the plaintiff. "When a plaintiff brings a section 1983 claim against a defendant who is not a government official or employee, the plaintiff must show that the private entity acted under the color of state law. This requirement is an important statutory element because it sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law." Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 822–23 (7th Cir. 2009).

"A state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Id. at 823 (quoting Blum v. Yaretsky, 457 U.S. 991, 1004 (1982). The Supreme Court has set forth several tests for courts to employ in evaluating the "range of circumstances" that might constitute state action. Rodriguez, 577 F.3d at 823 (quoting Brentwood Acad. v. Tenn. Sch. Ath. Ass'n, 531 US. 288, 295 (2001)). In applying the tests, the Court emphasizes "the particular *function* of the medical care provider in the fulfillment of the state's obligation to provide health care to incarcerated persons." Rodriguez, 577 F.3d at 825 (emphasis in original). The Supreme Court elaborated on the functional analysis in West v. Atkins, 487 U.S. 42, 56-

9

57 n. 15 (1988), and advised that courts should focus on the relationship among the state, the health care provider, and the prisoner.

In Rodriguez, the Seventh Circuit cited with approval a Fourth Circuit case finding that a private physician who treated a prisoner's orthopedic problem in the physician's office outside the prison was acting under color of state law. Rodriguez, 577 F.3d at 827 (citing Conner v. Donnelly, 42 F.3d 220, 225 (4th Cir. 1994). That is similar to Dr. Grossman's treatment of the plaintiff at the hospital. At this stage, the court will consider Dr. Grossman to have been acting under the color of state law, and allow the plaintiff to proceed on a Fourteenth Amendment Due Process claim against Dr. Grossman.

The plaintiff's only allegations regarding Waupun Memorial Hospital and St. Agnesian Healthcare is that they were Dr. Grossman's employers. "It has long been established that there is no respondeat superior liability under section 1983." Rodriguez, 577 F.3d at 822. Like public municipal corporations, private corporations cannot be sued under a theory of *respondeat superior*. Id. "A private corporation is not vicariously liable under § 1983 for its employees' deprivations of others' civil rights." Id. (quoting Johnson v. Dossey, 515 F.3d 778, 782 (7th Cir. 2008)). "[L]ike a municipality, a private corporation can be liable if the injury alleged is the result of a policy or practice." Id.

There is no suggestion in the plaintiff's complaint that Dr. Grossman's decision to perform two surgical procedures other than the one to which the plaintiff had consented was anything other than his own exercise of professional judgment. There no allegation that either Waupun Memorial

10

Hospital or St. Agnesian Health Care had a policy or practice of performing surgical procedures to which patients had not consented. The court will dismiss these defendants.

The court will exercise supplemental jurisdiction over plaintiff's state law medical negligence claims against Dr. Grossman. See 28 U.S.C. § 1367(c). The plaintiff's medical negligence claims against Dr. Grossman are for failure to properly diagnose and for performing surgical procedures for which the plaintiff had not given informed consent.

### III. CONCLUSION

The court **GRANTS** the plaintiff's motion for leave to proceed *in forma pauperis*. Dkt. No. 2.

The court **ALLOWS** the plaintiff to proceed on Fourteenth Amendment claims against Dr. Thomas W. Grossman, and **ALLOWS** the plaintiff to proceed on state law medical negligence claims against Dr. Thomas W. Grossman.

The court **DISMISSES** Waupun Memorial Hospital and St. Agnesian HealthCare.

The court **ORDERS** the United States Marshal to serve copies of the complaint and this order upon defendant Dr. Thomas W. Grossman pursuant to Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. § 1921(a). The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§ 0.114(a)(2), (a)(3). Although Congress requires the court to order service by the U.S. Marshals Service

11

precisely because *in forma pauperis* plaintiffs are indigent, it has not made any provision for these fees to be waived either by the court or by the U.S. Marshals Service.

The court also **ORDERS** the defendants to file a responsive pleading to the complaint.

The court further **ORDERS** the Secretary of the Wisconsin Department of Corrections or his designee to collect from the plaintiff's prison trust account the $349.03 balance of the filing fee, by collecting monthly payments from the plaintiff's prison trust account in an amount equal to 20% of the preceding month's income credited to the prisoner's trust account and forwarding payments to the clerk of court each time the amount in the account exceeds $10 in accordance with 28 U.S.C. §1915(b)(2). The Secretary or his designee shall clearly identify the payments by the case name and number.

The court further **ORDERS** that, pursuant to the Prisoner E-Filing Program, the plaintiff shall submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the Court. The Prisoner E-Filing Program is in effect at Dodge Correctional Institution, Green Bay Correctional Institution, Waupun Correctional Institution, and Wisconsin Secure Program Facility and, therefore, if the plaintiff is no longer incarcerated at one of those institutions, he must submit all correspondence and legal material to:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse

517 E. Wisconsin Avenue
Milwaukee, Wisconsin 53202

**The plaintiff should not send copies of pleadings to the court's chambers.** Doing so will only slow proceedings. Because the clerk's office will electronically docket every pleading in the case, the plaintiff does not need to mail copies of his pleadings to the defendants. The court further advises the plaintiff that if he fails to timely file documents, this may result in the dismissal of his case for failure to prosecute. In addition, the parties must notify the Clerk of Court of any change of address. Failure to do so could result in orders or other information not being timely delivered, thus affecting the legal rights of the parties.

The court will send a copy of this order to the warden of the Wisconsin Secure Program Facility.

Dated in Milwaukee, Wisconsin this 22nd day of February, 2016.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge

13